IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 24-5-3 |
| | : | |
| TRELLY TAYLOR | : | |

**DEFENDANT TRELLY TAYLOR'S SENTENCING MEMORANDUM**

Trelly Taylor, by and through his undersigned counsel, hereby files the within Sentencing Memorandum in connection with his scheduled sentencing hearing of June 23, 2025 before the Honorable John R. Padova, United States District Court Judge:

**A. The Court Should Grant a Downward Variance by Declaring a Policy Disagreement with the Methamphetamine Sentencing Guidelines**

In *Spears v. United States,* 129 S.Ct. 840 (2009), the Supreme Court clarified its previous holding in *Kimbrough v. United States,* 128 S.Ct. 558 (2007) and held that districts courts had the authority to determine that the Guidelines' 100:1 ratio between cocaine and crack cocaine resulted in an excessive sentence in view of the sentencing factors set forth in 18 U.S.C. § 3553(a). The Court ruled that district courts could vary from the crack Guidelines categorically based on policy disagreements with them even in cases where a defendant did not present evidence of mitigating circumstances.

District courts throughout the country have relied upon the authority of *Spears* to vary downward from the Sentencing Guidelines for methamphetamine as a result of policy disagreements. For example, in *United States v. Diaz,* 2013 WL322243 at 16 (E.D.N.Y. Jan. 28, 2013), the Court placed little weight on the Guidelines range where the defendant was a middleman in a heroin distribution scheme, after concluding that Guideline ranges for drug trafficking offenses were not based upon empirical data, Sentencing Commission expertise or the actual culpability of the defendant. Id at *1. The Court adopted a one-third reduction for methamphetamine offenses and reserved the right to adjust the sentence further upon review of the 18 U.S.C. § 3553 (a) factors. Id. at * 18. Similarly, in *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013), the Court expressed a concern that the Sentencing Commission had relinquished its institutional role and, with respect to methamphetamine and that the Guidelines were excessive in nature and lacking consideration of the defendant's role in the offense. *Id.* at 1021. The court reduced the defendant's sentence by one-third of the base offense level for methamphetamine. See also, *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249 (D.N.M. 2017) (purity enhancement unwarranted resulting in a sentence within the methamphetamine mixture range)

In *United States v. Johnson,* 379 F.Supp.3d 1213 (M.D. Alabama 2019), the court declared a policy disagreement with the methamphetamine Guidelines based

2

upon their inherent assumptions regarding purity and quantity. The court agreed with other courts that have increasingly recognized that "drug quantity is a poor proxy for culpability." Id. at 1220, quoting *Diaz*, supra at *13. The court in *Johnson* emphasized that the Guidelines' reliance on drug quantity failed to take into account other factors that were more important, including the defendant's role in the offense. "The bottom line is that drug quantity does not always correspond with a defendant's role or culpability, and the problem is not sufficiently offset by the Guidelines' downward adjustments for mitigating role." Id. at 1222.

  Courts have also been critical of the of the underlying theory behind increased sentences based upon drug purity. In *United States v. Ibarra-Sandoval*, supra, the court characterized the Guidelines' assumed connection between drug purity and criminal role as "divorced from reality." Id at 1255. The national average purity of methamphetamine has dramatically increased as Mexican cartels now control manufacture and distribution. Therefore, the Guidelines would be more likely treat the average person convicted of a methamphetamine crime as a kingpin or leader when, in fact, his role in the offense might be significantly less. "In other words, the high purity of methamphetamine in a specific case does not reliably indicate the offender's role in the drug trade, given that methamphetamine throughout the U.S. market is highly pure." *Johnson*, supra at 1124.

Instantly, the quantity of methamphetamine seized from the three co-defendants at the airport along with the purity of the drug results in a base offense level of 38 under the Guidelines. PSR at ¶ 21. It is submitted that this case represents an example of the drug quantity and purity not functioning as an accurate proxy for the defendant's role in the offense and his overall culpability. This Court is invited to grant a downward variance on policy grounds to offset what would otherwise be a high quantity-driven base level offense. See *United States v. Carillo*, 440 F.Supp. 3d 1148, 1154 (E.D. California 2020); *United States v. Johnson,* supra at 1221. See also PSR at ¶ 88 ("The defendant's offense level is driven by the quantity of drugs" and "the conduct reflects a singular incident.")

**B.     The Court Should Grant a Downward Mitigating Role Adjustment**

In 2015, the United States Sentencing Commission recommended to federal judges that the mitigating role adjustment set forth at U.S.S.G. §3B1.2 should be applied with greater frequency in drug trafficking offenses. However, in proposing amendments in 2025 to reduce the sentences for low-level drug offenders, the Sentencing Commission observed that Judges were not applying these reductions more frequently for offenders playing a minor or minimal role. "Commission data shows that the prior amendment did not result in a sustained increase in application of the mitigating role adjustment in § 2D1.1 cases."

In an effort to induce courts to apply the mitigating role adjustments more frequently, the Sentencing Commission has proposed that judges should consider whether the offender's "primary function" was lower level, effectively lowering the eligibility threshold for a §3B1.2 mitigating role adjustment. Part A of the Amendment contains two subparts: Subpart 1 of Part A amends the mitigating role provisions in § 2D1.1(a)(5) to refine the drug trafficking guideline in cases where a defendant receives an adjustment under §3B1.2. The amendment sets a mitigating role cap at level 32 if the defendant receives an adjustment under §3B1.2 and has a base offense level of above 34. A mitigating role cap of 30 would be applied if the defendant has a resulting offense level greater than 30 and receives a 4-level adjustment under §3B1.2(a).

Importantly, the mitigating role provision of §2D1.1(a)(5) applies regardless of whether the defendant receives the required adjustment from §3B1.2 or by use of the new special instruction in 2D1.1 (e) (2)(B), which states, in relevant part:

> "For purposes of subsection (e) (2)(B), the provisions of §3B1.2 apply in determining whether a mitigating role adjustment is warranted, except that the adjustment shall apply regardless of whether the offense involved other participants in addition to the defendant, and regardless of whether the defendant was substantially less culpable than the average participant in the criminal activity. The extent of the adjustment shall be based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

The Amendment further provides that a 4-level adjustment under § 3B1.2(a) is generally warranted if the defendant's primary function in the offense was "plainly among the lowest level of drug trafficking functions, such as serving a courier, running errands, sending or receiving phone calls or messages, or acting as a lookout." A two-level adjustment under § 3B1.2(b) is generally warranted where the defendant's primary function was performing other low-level trafficking functions, such as distribution of controlled substances in user-level quantities or with a primary motivation other than profit.

While at first blush it seems counterintuitive that Mr. Taylor should receive a mitigating role adjustment in a case that involves the trafficking of nearly 90 pounds of pure methamphetamine, the evidence that has been obtained by the government and disseminated to counsel through discovery suggests that the Defendant's role in the overall distribution offense was limited.  By all appearances, Mr. Taylor's role was to act as a courier; he and his two co-defendants were to transport the drugs in checked luggage to Philadelphia International Airport from Los Angeles.  The drugs were discovered after agents focused on the two co-defendants, Kparyea Tankwai and Henrie Tankwai, who booked their tickets allegedly within close proximity of their departure time. When the luggage arrived in Philadelphia, but before it was placed on the baggage carousel, a narcotics K9 alerted to the two bags as well as a third bag belonging to the Defendant.  It was later revealed that a small amount of

marijuana was present in two of the bags containing methamphetamine including the one retrieved by Trelly Taylor. After attempting to flee, all three Defendants were apprehended and arrested at the airport following execution of a search and seizure warrant.

Unlike drug kingpins and manufacturers who use others to transport their product, the Defendants were clearly unsophisticated, even amateurish, in their efforts to smuggle the drugs into the airport. There is no evidence they received a large amount of compensation for their efforts. The circumstances of their arrests suggest they were couriers or mules who were tasked with transporting the three bags containing drugs from Los Angeles and retrieving them in Philadelphia. While their actions were knowing and intentional, it is nevertheless clear that the roles they played in the commission of the overall offense were minor when compared with persons or organizations who manufacture, package and deliver the product for transport. This is consistent with the kinds of activities that low-level, unsophisticated drug offenders engage in.

The government opposes a minor or mitigating role adjustment because, in its view, the Defendant has not put forth evidence in support of his claim and the record is devoid of evidence to support a minor role adjustment. Mr. Taylor's position is that the Court is permitted to make a determination based upon the facts the government has recited in its guilty plea memorandum and the content of the

Presentence Investigation Report. Aside from the large quantity of methamphetamine recovered, nothing suggests the Defendant was involved in the manufacture or supply of the drugs. On the contrary, his role clearly was to carry the drugs from Los Angeles to Philadelphia. There is nothing in the Defendant's background or in the discovery produced by the government that suggests he had an ownership interest in the product, that he was a leader of a drug organization. In short, notwithstanding the quantity of the drugs recovered, this Court can make a common sense finding that the defendant played a minor or minimal role in the offense and that he is entitled to a appropriate adjustment under the Guidelines.

**C.  The Court Should Grant a Downward Variance Upon Consideration of Mitigating Factors.**

The "district court should begin all sentencing proceedings by correctly calculating the applicable Guideline range. . . . [and] the Guidelines should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49. After correctly calculating the Guideline range, the Court is directed to consider the factors set forth at 18 U.S.C. § 3553. The Guideline ranges are no more controlling of the final sentencing decision than any of the other multiple factors which must be considered under §3553(a). *United States v. Grier*, 475 F.3d 556, 571 (3rd Cir. 2007) ("the Sentencing Reform Act mandates that the district

8

court 'consider' the factors of 18 U.S.C. §3553(a)"); *United States v. Gunter*, 462 F.3d 237, 247 (3rd Cir. 2006).

As the First Circuit noted in *United States v. Rodriguez*, 527 F. 3d 221 (1st Cir. 2008), *Kimbrough* made clear that:

> [S]ection 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle. That tenet (sometimes referred to as the parsimony principle), instructs district courts to impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing. This overarching principle necessarily informs a sentencing court's consideration of the entire constellation of section 3553(a) factors, including the need to avoid unwarranted disparity. Similarly, judicial interpretation of section 3553(a) should be guided by the broadly worded goals of sentencing spelled out in section 3553(a)(2), to which *Kimbrough* pays homage.

Id. at 228 (citations omitted).

Mr. Taylor urges the Court to consider the following:

### 1. The nature and circumstances of the offense:

While the crimes committed by Mr. Taylor are without question serious, his case must be treated individually. He is not a drug manufacturer or the head of a drug organization. He acted on one occasion as a courier. Unfortunately, the penalties for methamphetamine are unreasonably high in the opinion of some courts when compared with other drugs. DEA data show that most methamphetamine confiscated today is "pure" regardless of whether the defendant is a kingpin or a low-level addict. See, e.g., *United States v.*

9

*Hendricks,* 307 F. Supp. 3d 1104, 1108 (D. Idaho 2018) ("Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution." ); *United States v. Carillo,* 440 F. Supp. 3d 1148 (E.D California 2020).

    Moreover, as was discussed earlier, some courts have questioned whether drug quantity, too, is a reliable measure of offense seriousness. Over the past decade, courts have increasingly recognized that "drug quantity is a poor proxy for culpability." *United States v. Diaz,* 2013 WL322243 at *16 (E.D.N.Y. Jan. 28, 2013). See, *United States v. Hayes,* 948 F.Supp 2d. 1009 (N.D. Iowa 2013); *United States v. Ibarra-Sandoval,* 265 F.Supp. 3d 1249) (D.N.M. 2017); *United States v. Carrillo, supra.*

    Mr. Taylor's case should be distinguished from the defendants who have a long history of drug trafficking and who have profited financially from their crimes. His actions in this instance should not be lumped together with manufacturers and suppliers whose conduct was far more egregious than this Defendant's. As the Presentence Investigator in the PSR at ¶ 88, and for the reasons set forth in Argument A above, the Defendant's offense level is driven by the quantity of drugs he and his co-defendants possessed at the time of their arrests. While it was a significant amount, "the conduct reflects a singular

incident and he has no prior adjudication or adult conviction which involved drug activity." PSR at ¶ 88.

### 2. The history and characteristics of the Defendant:

Trelly Taylor was born in Philadelphia on June 11, 1993. He is currently 32 years of age. His mother, Tiffany Taylor, age 47, was not married to the Defendant's father, and when asked about his father, Mr. Taylor said, "I don't have a father." PSR at ¶42. He was raised by his maternal grandmother in a home in North Philadelphia. He had a very close relationship with his grandmother. She passed away on December 23, 2016 shortly before the Defendant was released from state prison on parole in January, 2017. PSR at ¶32.

Since 2011, Mr. Taylor has been in a relationship with Jaynae Gray, age 30. They have a daughter, Ri'mor Taylor (age 6). Mr. Taylor and Ms. Gray have a close relationship; they speak daily by telephone and she and her daughter have visited every weekend since Mr. Taylor has been in custody. When interviewed, Ms. Gray explained that the Defendant was devastated when his grandmother passed away. She added that his mother placed him in foster care when he was two years old without informing other members of the family, and that Mr. Taylor and his mother have had a "tumultuous" relationship. PSR 47. When he was paroled from prison in January, 2017, he

11

felt lost following the death of his grandmother. In the same year, his best friend was shot and killed in North Philadelphia. PSR at ¶44.

In a letter attached to this Memorandum, Ms. Gray states that Mr. Taylor has always been a good friend to her and is a loving father to their daughter. In her opinion, Mr. Taylor's lack of guidance and support from his parents may have played a part in the circumstances that currently face him. She believes however that he has accepted responsibility for his mistakes and for the consequences of his poor decisions.

Also attached to this Memorandum is a letter from Kalah Miles, a niece-in-law of the Defendant. She also states that that he is a good father and that despite regrets for the mistakes he has made in life, he is determined to do better in the future.

In 2019, Mr. Taylor was shot twice in the back. He received treatment, including surgery consisting of an exploratory laparotomy for two weeks as an in-patient at Temple University Hospital. When he recently complained of abdominal pain in December, 2023, an x-ray revealed bullet fragments over the left mid lung and upper abdomen. PSR 56

With respect to education and employment, Mr. Taylor graduated with a high school degree on June 21, 2013. He has had very limited employment. he worked as a dishwasher for six months at Marathon Grill in 2019. He also

assisted with childcare responsibilities following the birth of his daughter. He currently works as a food server at the FDC in Philadelphia and assists in cleaning the counselor's office and his block. PSR 64-68.

The Court is urged to take into account the difficulties Mr. Taylor encountered in growing up as a young person with no contact with his father and limited contact with his mother as a child. Nevertheless, he has is in a stable relationship with Ms. Gray and they have a child together. He has one state conviction for robbery. The commission of that offense was in 2013 when he was 19 years of age. He was released on parole in 2017 and parole supervision expired two years later. Importantly, although he was arrested as a juvenile, he did well in programs for youthful offenders, completed a probationary period and was permitted to enroll back in public school in the Fall of 2010. PSR at ¶ 31. This history suggests he is amenable to education and programs that encourage growth and improve his skills. Mr. Taylor has expressed an interest in learning everything he can to better himself while in BOP custody. PSR at ¶65. This Court could require him to participate in a comprehensive vocational training program while in prison as a condition of his sentence. He would then be subject to release with the training he would need to lead a productive life and support his family.

### 3. The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

The Defendant is faced with a 10-year mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(A). It is submitted that a 10-year sentence would adequately reflect the seriousness of the offense and promote respect for the law. Given that the Defendant has not filed pretrial motions, has pleaded guilty to the crimes charged in the Indictment and has incurred one minor disciplinary infraction while incarcerated at the FDC, a mandatory sentence of ten years would likewise provide just punishment.

### 4. The need to afford adequate deterrence and to protect the public

Again, Mr. Taylor faces a mandatory minimum 10-year sentence. He would be 42 when released from federal confinement and presumably would be subject to five years of supervised release thereafter. Imposition of a Guidelines sentence that would subject him to incarceration within the range of 188-235 months is not necessary to afford adequate deterrence and protect the public.

### Conclusion

The Court is respectfully requested to grant a downward variance from the sentencing guideline range for the reasons set forth above after due consideration of the section 3553(a) factors and "impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing.

Respectfully submitted.

_____
/s/ JEREMY C. GELB, ESQ.
834 Chestnut Street, Suite 206
Philadelphia, PA  19107
(215) 922-2415
jeremygelbesq@gmail.com

15

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Sentencing Memorandum has been served on this date via electronic filing and/or via email to the following individual(s).

>	Meghan E. Claiborne
>	Assistant United States Attorney
>	Meghan.Claiborne@usdoj.gov


>	_____
>	/s/ JEREMY C. GELB, ESQ.
>	834 Chestnut Street, Suite 206
>	Philadelphia, PA  19107
>	(215) 922-2415
>	jeremygelbesq@gmail.com

Date: June 17, 2025